UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| RAYMOND CLAY U., JR.,[1] | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:22-cv-00070-TWP-KMB ) |
| KILOLO KIJAKAZI Acting Commissioner of Social Security Administration, | ) ) ) |
| Defendant. | ) ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Raymond Clay U., Jr. ("Raymond U.") appeals the Administrative Law Judge's decision denying his application for Social Security Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act. For the reasons set forth below, the Court **remands** the decision of the Commissioner.

### I. PROCEDURAL BACKGROUND

On October 31, 2016, Raymond U. filed an application for Disability Insurance Benefits, alleging a disability onset date of August 26, 2014 (Filing No. 15-3 at 2). His application was initially denied on December 15, 2016, *id.*, and upon reconsideration on February 28, 2017, *id.* at 12. Administrative Law Judge Renita K. Bivins (the "ALJ") conducted a hearing on October 23, 2018, at which Raymond U., represented by counsel, and a vocational expert appeared and testified. *Id.* at 28. The ALJ issued a partially favorable decision on January 14, 2019, concluding that Raymond U. was disabled as of a later onset date—June 7, 2018—but was not disabled

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

between August 26, 2014, and June 6, 2018. *Id.* at 24–40. The Appeals Council granted Raymond U.'s request for review. On September 16, 2020, the Appeals Council affirmed the portion of the ALJ's decision finding that Raymond U. was disabled beginning June 7, 2018, but vacated and remanded the portion of the decision finding that Raymond U. was not disabled between August 26, 2014, and June 6, 2018. *Id.* at 45. The Appeals Council held that the January 14, 2019 decision:

> [did] not contain adequate rationale in support of the established onset date of disability. Specifically, the decision reflects that the claimant had tried many treatment options with little success by June 7, 2018, when a spinal cord stimulator was recommended . . . . However, the recommendation of a spinal cord stimulator was made in response to several years of chronic pain and other failed treatment measures. The examination findings cited in support of the onset of disability are similar to prior examination findings in the record. Thus, further evaluation of whether the claimant was under a disability for the period prior to June 7, 2018, is warranted.

*Id.* at 45.

The ALJ held two remand hearings by telephone due to the COVID-19 pandemic ([Filing No. 15-2 at 17](#)). On May 6, 2021, Raymond U., represented by counsel, attended and testified. A vocational expert also attended but did not testify due to technical difficulties. *Id.* On June 10, 2021, at the second hearing, Raymond U., represented by council, and a different vocational expert attended and testified. *Id.* On August 30, 2021, the ALJ issued an unfavorable decision as to the period of August 26, 2014, to June 6, 2018, again finding that Raymond U. was not disabled until June 7, 2018. *Id.* at 16–34. On January 21, 2022, the Appeals Council denied Raymond U.'s request for review of the ALJ's August 30, 2021 decision, making it the final decision of the Commissioner. *Id.* at 2–4.

On March 23, 2022, Raymond U. timely filed a civil action in the Southern District of Ohio under 42 U.S.C. § 405(g), seeking a review of the decision denying him benefits for the relevant time period of August 26, 2014, to June 6, 2018 ([Filing No. 1](#)). On the parties' joint motion, the case was transferred to this Court on May 20, 2022 ([Filing No. 8](#); [Filing No. 9](#)).

## II.     STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).  To be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled.  At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors.  20 C.F.R. § 404.1520(a)(4)(i).  At step two, if the claimant does not have a "severe" impairment that also meets the durational requirement, he is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps.  *See* 20 C.F.R. § 404.1520(a)(4)(iv)–(v).  Residual functional capacity

("RFC") is the "maximum that a claimant can still do despite [his] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1)(3); Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184). At step four, if the claimant can perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy. *Id.*

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. For the purpose of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and

the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

### III.    FACTUAL BACKGROUND

When Raymond U. filed, he alleged that he could no longer work due to a leg injury he suffered in 2014 while working as a mail carrier (Filing No. 15-3 at 6). He was 46 years old when his alleged disability began, making him a "younger individual" on his alleged onset date. *Id.* at 3. He is a high school graduate and worked as a postman, machinist, custodian, electrician's apprentice and laborer. *Id.* Raymond U. contends his disabling impairments are degenerative disc disease, left Achilles tendinosis and tear status post-surgical repair, and complex regional pain syndrome, psychological features related to pain disorder, and obesity. (Filing No. 22 at 2.) The relevant evidence of record is amply set forth in the parties' briefs as well as the ALJ's decision and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

The ALJ first determined that Raymond U. had not engaged in substantial gainful activity since the alleged onset date of August 26, 2014 (Filing No. 15-2 at 19). At step two, the ALJ found that Raymond U. had the following severe impairments during the relevant time period: mild lumbar degenerative disc disease, status post left ankle Achilles tendon tear and repair, and complex regional pain syndrome left heel. *Id.* At step three, the ALJ found that Raymond U.'s

5

impairments did not meet or equal a listed impairment during the relevant time period. *Id.* at 19–20. The ALJ then found that, during the relevant time period, Raymond U. had the RFC:

> to perform light work as defined in 20 CFR 404.1567(b) except as follows: He was able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; he was able to stand and/or walk for 4 hours per 8 hour day and sit for 6 hours per 8 hour day with normal breaks; he could have occasionally climbed ramps or stairs; he never could have climbed ladders, ropes, or scaffolds; he could have occasionally balance[d] as defined by the *Selected Characteristics of Occupations*; he could have occasionally stooped, kneeled, crouched and crawled; he could have performed occasional pushing and pulling with the left lower extremity; he could have engaged in work that could have been performed whether sitting or standing and remained on task; he should have avoided concentrated exposure to extreme cold; he should have avoided all exposure to unprotected heights of ladders ropes or scaffolds, heavy machinery and commercial driving. Due to medical conditions, symptoms, effects of medication and pain he was expected to have been able to remain on task 92% of the work period (rendered off task 8% of the work period).

*Id.* at 20.

At step four, the ALJ found that Raymond U. was not able to perform his past relevant work during the relevant time period. *Id.* at 31–32. At step five, the ALJ, relying on testimony from a vocational expert, determined that Raymond U. was able to perform jobs that exist in significant numbers in the national economy. *Id.* at 32–34. Accordingly, the ALJ concluded Raymond U. was not disabled between August 14, 2016, and June 6, 2018. *Id.* at 34.

## IV. **DISCUSSION**

Raymond U. argues the ALJ's decision was erroneous in three ways: (1) her RFC determination was not supported by substantial evidence; (2) her RFC determination was contrary to medical opinions of record; and (3) she failed to consider whether Raymond U.'s impairment met or equaled Listing 11.14 at step three (Filing No. 22 at 1). The Court will address these arguments in turn to the extent necessary to resolve the appeal.

1.      **Failure to Support Decision with Substantial Evidence**

Raymond U. first and primarily argues that the ALJ "misinterpreted the Appeals Council's Remand Order" and failed to adequately support her conclusion that his impairment was less severe during the relevant time period than it was by June 7, 2018, and her decision that he was therefore not disabled during the relevant time period (Filing No. 22 at 11).  Raymond U. contends that the ALJ "cherry-picked" evidence, mischaracterized medical records, and drew unfounded assumptions in identifying distinctions between his impairment before and after June 7, 2018.  *Id.* at 12.  In response, the Commissioner argues that the "substantial evidence" standard is highly deferential and that "the ALJ explained why she found Plaintiff's impairments became worse as of June 2018," so remand is not warranted (Filing No. 24 at 4).

The Court agrees with Raymond U. that the ALJ did not support her decision with substantial evidence.  But before discussing the specific faults in the ALJ's evidentiary analysis, the Court must address a more overarching error the ALJ committed.

Instead of determining whether Raymond U. was "disabled" during the relevant time period, the ALJ focused exclusively on determining whether Raymond U.'s impairment was less severe before June 7, 2018, than on and after June 7, 2018.  The ALJ's entire decision was based on the false premise that if Raymond U.'s impairment was less severe before June 7, 2018, he must not have been "disabled" during that time. (*See, e.g.*, Filing No. 15-2 at 26 ("[O]bjective physical findings during the period at issue also demonstrate that the level of dysfunction later shown was not present to the same degree as evidence [sic] by June 7, 2018."); *id.* at 27 ("These visits further demonstrate that the level of dysfunction described by Dr. Miller in June 2018 was simply not present to the same degree during the period at issue."); *id.* at 28 ("Such testimony suggests greater ability than shown in Dr. Miller's June 2018 records.".)  Notably, the Appeals Council did not instruct the ALJ to determine only whether Raymond U.'s impairment was less severe prior to June

7, 2018; it instructed the ALJ to re-evaluate "whether the claimant *was under a disability* for the period prior to June 7, 2018" (Filing No. 15-3 at 45 (emphasis added)).

While Raymond U. would surely be considered "disabled" if his impairment was equally as severe before June 7, 2018, as it was after, he could still be considered "disabled" even if his impairment was less severe. Neither the ALJ nor the Commissioner cites any authority indicating that the severity of Raymond U.'s impairment as of June 7, 2018, sets the threshold for disability. Stated differently, even if Raymond U.'s impairment was less severe during the relevant time period, the ALJ failed to explain why Raymond U.'s less severe impairment was not a "disability." That error alone warrants remand.

In addition, however, the ALJ failed to support with substantial evidence her subjective symptom analysis and RFC determination. The ALJ began her step-four analysis with the statement that, in making her finding:

> the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527.

(Filing No. 15-2 at 20.) The ALJ found that "the frequency and nature of [Raymond U.'s] allegations are inconsistent with the objective medical evidence of record, which does not support total work preclusion prior to . . . June 7, 2018," and that "limiting the claimant to a modified range of light work with severe postural and environmental restrictions adequately reflects the claimant's retained physical capabilities prior to June 7, 2018." *Id.* at 21.

The ALJ then summarized Raymond U.'s subjective complaints, work history, supplemental income, and medical records at length and concluded that "[a]fter careful consideration of the evidence . . . the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other

evidence in the record for the reasons explained in this decision" (Filing No. 15-2 at 26). However, "[a] summary is not analysis, as it does not explain *why* the evidence summarized undermined Plaintiff's statements about his symptoms or limitations, or which statements were inconsistent." *Michael L. v. Saul*, No. 20cv238, 2021 WL 1811736, at *8 (N.D. Ind. May 6, 2021) (emphasis in original) (citing *Craft*, 539 F.3d 677–78).

The ALJ's actual analysis addressed very little of the record evidence, undoubtedly because she addressed only the evidence she thought would distinguish the severity of Raymond U.'s impairment before and after June 7, 2018. The evidence analyzed by the ALJ, which the Court will discuss in turn, is not relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Zoch*, 981 F.3d at 601. The ALJ therefore failed to support her finding with substantial evidence.

a. **Evidence Regarding Assistive Devices**

The ALJ first noted that "claimant testified that he was previously using a cane, but his prescription later changed to Australian braces with one on each arm" around June 2018 (Filing No. 15-2 at 26). From this, the ALJ concluded that Raymond U.'s impairment must have become substantially or progressively worse leading up to June 7, 2018. *Id.* ("This change represents a substantial worsening in terms of mobility and retained functional ability. . . . [D]ue to progressive worsening that culminated in the claimant's need for a two-brace cane, Dr. Miller recommended an SCS."). Relatedly, the ALJ noted that "[p]rior medical records do not indicate that the claimant was using a cane for each of his visits/examinations." *Id.* The ALJ concluded that this information showed a "discrepancy" between Raymond U.'s statements and the objective medical evidence, and "strongly suggest[ed] that the use [of an assistive device] was not medically necessary and/or he was able to ambulate without an assistive device [before June 7, 2018], albeit with an antalgic gait and pain." *Id.* These conclusions are flawed in several ways.

9

First, the ALJ provided no support for the conclusion that Raymond U.'s switch to arm braces, in and of itself, indicates that his impairment had become more severe. The ALJ cited no medical evidence (or any evidence) explaining when or why arm braces would be prescribed instead of a cane, much less any evidence confirming that arm braces are only prescribed for severe impairments. The ALJ based this conclusion solely on her own interpretation of the medical records and lay understanding of assistive devices. The Seventh Circuit has repeatedly cautioned that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor," but that is precisely what the ALJ did here. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).

Second, the ALJ's conclusion that Raymond U. either did not consistently use or need an assistive device before he was prescribed arm braces is based on conjecture. Though not all of the medical records during the relevant time period note that Raymond U. was using an assistive device,[2] that does not mean that he was not using one or, more importantly, that he did not need one. Indeed, some records dated after June 7, 2018, do not mention Raymond U.'s arm braces, yet the ALJ does not question whether he needed or used them (Filing No. 15-7 at 319). The ALJ could have requested additional evidence from Raymond U.'s physicians about his use of an assistive device before being prescribed the arm braces, but she did not. She cannot remedy that failure by simply assuming that Raymond U. did not have and did not need one prior to June 7, 2018.

Lastly, the evidence is unclear as to when Raymond U. began using arm braces. Though the ALJ concluded that his switch to arm braces shows that he retained greater "vocational ability prior to June 7, 2018," the medical records indicate that he was prescribed arm braces in March

---

[2] Some of the medical records do mention Raymond U.'s use of a cane (Filing No. 15-7 at 386 (noting him "leaning heavily on a cane in his left hand" during his April 21, 2017 visit with Dr. Wolf).

2018 (Filing No. 15-7 at 321). The ALJ again sought no clarification as to the date on which Raymond U. began actually using the arm braces. She simply assumed that he began using them on June 7, 2018, which was the first date that a physician observed Raymond U. using them (Filing No. 15-2 at 26 ("[O]ne significant difference was that the claimant was observed walking with a two-brace cane.")). If Raymond U. began using the arm braces in March 2018, then his use of those arm braces would not support the ALJ's conclusion that his impairment became substantially worse in June 2018. For all of the above reasons, the evidence regarding Raymond U.'s use of assistive devices does not support the ALJ's subjective symptom analysis or RFC determination.

        **b.**      <u>**Objective Physical Findings**</u>

The ALJ next identified several "objective physical findings" that she believed "demonstrate that the level of dysfunction later shown was not present to the same degree as evidence [sic] by June 7, 2018" (Filing No. 15-2 at 26). The ALJ first stated that "in May 2016 the claimant reported pain percentage reduction of 60% after lumbar sympathetic block" and "in June 2016, the record indicates the claimant reported 60% reduction in pain after a lumbar sympathetic block and that a previous injection helped with a 20% pain reduction." *Id.* at 26–27 (citing Exhibit 5F/6). This finding relies on mischaracterized evidence. The records cited by the ALJ show that the lumbar sympathetic blocks administered in April, May, and June 2016 resulted in a 60% pain reduction "*[a]t 15 minutes post procedure*" (Filing No. 15-7 at 215–17 (emphasis added)), and that by June 2016, Raymond U. reported that the prior month's injection "*only* helped 20%," indicating how quickly the relief from the nerve block had dissipated (Filing No. 15-2 at 27 (emphasis added)). Further, the ALJ failed to explain how the short-term relief provided by the lumbar nerve blocks is inconsistent with Raymond U.'s subjective complaints. To the contrary, the bulk of the medical records clearly indicate that the nerve blocks did not provide any long-term relief, consistent with Raymond U.'s statements. *See* Filing No. 15-7 at 221 (noting in January

11

2017 that Raymond "[d]enies any improvement in pain changing from hydrocodone to oxycodone *or from any previous treatments up to this point*. . . . He has tried multiple avenues of treatment for pain control *including sympathetic nerve block*, . . . without any improvement in pain control." (emphasis added)); *see also* Filing No. 15-7 at 415 (noting in July 15, 2016 visit notes that Raymond "was referred to Dr. Kruer where he had 3 sympathetic nerve block with no relieve to his pain"); (*see also* Filing No. 15-2 at 47, 116).

Next, the ALJ cited examination records from Dr. John Bartsch containing "essentially normal" electrodiagnostic testing,"[3] reports of "intact strength at the lower extremities, no signs of muscle atrophy, and intact sensation," and reports that Raymond U. was "negative for fatigue, heat and cold intolerance, gait disturbance, joint swelling and muscle weakness" (Filing No. 15-2 at 27). The ALJ described these findings as "relatively benign" and "not consistent with Dr. Miller's findings approximately two years later," though the ALJ did not cite to or describe any specific findings by Dr. Miller. *Id.* Except for the conclusory statement that Dr. Bartsch's findings are inconsistent with Dr. Miller's findings, the ALJ did not explain how Dr. Bartsch's findings support her subjective symptom analysis or RFC determination. It is further unclear whether the specific findings cited by the ALJ would offer any support whatsoever, because those findings appear to conflict with other findings in the same records. For example, the "Review of Systems" sections from Dr. Bartsch's records note that Raymond U. is "Negative" for "gait disturbance," but the same records also note that "[h]is gait is antalgic" and that the purpose of Raymond U.'s visit was leg and back pain, which Raymond U. rated "a 9/10," (Filing No. 15-7 at 398, 405, 410), that Raymond

---

[3] The "electrodiagnostic testing" appears to have been testing for nerve disease and nerve damage (Filing No. 15-2 at 27 (citing Exhibit 14F/22, 23)); (Filing No. 15-7 at 396, Exhibit 14F (finding "[n]o electrodiagnostic evidence to support a focal neuropathy, LS radiculopathy, LS plexopathy, myopathy or large fiber peripheral neuropathy"); *Neuropathy*, Taber's Medical Dictionary (24th ed. 2021) ("Any disease of the nerves"); *Radiculopathy* ("Any disease of a nerve root"); *Plexopathy* ("Any disease of a (peripheral) nerve plexus"); *Myopathy* ("Any congenital or acquired muscle disease, marked clinically by focal or diffuse muscular weakness.")).

U. "had difficulty walking and … was in a boot for a long period of time," that "the pain has progressively worsened overtime [sic]," and that "his pain is worsened with walking, sitting, standing, walking [sic], bending forward and bending backwards." *id* at 415, 418); *see id.* at 413 ("He reports a lot of hyperesthesia left lower leg and foot. . . . He states that his pain is progressively worse."); *see also Tina C. v. Kijakazi*, No. 21-cv-9, 2022 WL 1013293, at *5 (S.D. Ind. Apr. 5, 2022) (finding "[t]he ALJ's reliance on review of systems sections of treatment notes does not support his evaluation" because those sections conflicted with the purpose of the visit and other visit notes).

Because the "objective physical findings" noted by the ALJ consist of cherry-picked and/or mischaracterized portions of Raymond U.'s medical records, the ALJ erred in relying on them.

        **c.**    **Evidence of Ability to Walk and/or Stand**

The ALJ also noted that Raymond U. was able to walk from the parking lot to the medical facilities for examinations, and that he would stand during the examinations (Filing No. 15-2 at 27). The ALJ found that this evidence "demonstrates that the level of dysfunction described by Dr. Miller in June 2018 was simply not present to the same degree during the period at issue." *Id.*

At the June 10, 2021 hearing, Raymond U. did testify that he was able to walk from the parking lot to his doctors' offices for medical appointments (Filing No. 15-2 at 52). However, the Court cannot discern how this testimony might conflict with other evidence, particularly because the ALJ did not inquire as to whether Raymond U. could walk that distance unassisted[4] or what that distance even was (Filing No. 15-2 at 27 (citing Exhibit 13F/3); Filing No. 15-7 at 387 ("The patient estimates that he is able to walk less than one half a block, even using his cane.")). It is not

---

[4] The ALJ may have assumed that Raymond U. could walk that distance unassisted because his examination notes did not mention him using an assistive device. But she did not state as much in her decision and, as discussed above, any such assumption would not be supported by the cited evidence.

even clear how this testimony might be inconsistent with Dr. Miller's 2018 findings, as the ALJ did not cite any findings from Dr. Miller regarding the distance Raymond U. could walk after June 7, 2018, or whether he needed an assistive device to do so. The ALJ's references to evidence that in February 2017, Raymond U. was "able to go to class for training," and that "in the mornings his foot was not *as* painful" (Filing No. 15-2 at 27 (emphasis added),) are likewise lacking in detail, and their relation to the ALJ's subjective symptom analysis and RFC determination are not apparent.

Additionally, the ALJ's stated that "despite reportedly being in pain, it was noted that the claimant did not sit down during the visit". *Id*. This statement is a gross mischaracterization of the medical records. The ALJ cited page 18 of Exhibit 10F/6, a medical record from Dr. Justin Kruer. What that record actually says is that Raymond U. was "*unable to sit still* during visit *due to constant foot pain*," not that Raymond did not sit down (Filing No. 15-7 at 335 (emphasis added) (stating Raymond U. rated his pain "10/10")). The ALJ cited no evidence whatsoever indicating that Raymond U. stood, or could stand, for the duration of his medical examinations.

The ALJ did not draw any logical bridge between the above evidence and her RFC determination—specifically, the determination that Raymond U. could walk or sit for four hours of an eight-hour workday and sit for six hours or an eight-hour workday with normal breaks.

### d. Evidence of Psychological Condition

The ALJ noted throughout her decision that Raymond U. was "pleasant, alert and only in mild distress" during his examinations and generally showed a "normal" mood and affect (Filing No. 15-2 at 27). Though the ALJ correctly recited portions of Raymond U.'s medical records, she did not explain how these normal findings conflict with his complaints of debilitating leg and back pain. "As it is, the Court is left to speculate as to what conclusions the ALJ may have drawn from the myriad normal findings cited in the decision and the basis for those conclusions. The requisite

logical bridge is therefore lacking." *Derek N. v. Kijakazi*, No. 21-cv-737, 2022 WL 1558432, at *5 (S.D. Ind. Apr. 27, 2022). The ALJ also noted that Raymond U. "had never been diagnosed with depression" and that he "denied anxiety" (Filing No. 15-2 at 27). But "[a]gain, it is unclear what the ALJ believes the import of these notations from various healthcare providers is. . . . Critically, none of the providers in question were treating Claimant for mental health issues; the notations about Claimant's mental health status are therefore highly unlikely to reflect any actual examination or consideration by the healthcare provider." *Derek N.*, 2022 WL 1558432, at *5.

In short, it is unclear how the ALJ believed that the above evidence of Raymond U.'s mood and psychological health were relevant to her assessment of his subjective symptoms or her RFC determination, "but it is clear that it was error for her to include them as a basis for that assessment without building the requisite logical bridge between them and her conclusion." *Id.*

e. **Evidence of Daily Activities**

The ALJ identified evidence regarding Raymond U.'s daily activities that she believed show "inconsistencies that suggest a higher level of retained ability than described by June 2018" (Filing No. 15-2 at 28). First, the ALJ noted that around midnight each night, when Raymond U. was unable to sleep due to pain, he would pace around his house, walk down the stairs one stair at a time to the living room, and watch television or read until he fell back asleep around 3:00 a.m. or 4:00 a.m. (Filing No. 15-7 at 387; Filing No. 15-2 at 52, 118–19). The ALJ concluded that based on this evidence, the restrictions in her RFC determination were appropriate because "activities [such] as reading and watching movies on [a] computer require[] some degree of focus and attention" (Filing No. 15-2 at 27). Critically, the ALJ failed to specify the "degree" of focus and attention to which she referred, or support her implicit conclusion that a person who can watch television or read between midnight and 4:00 a.m., while trying to fall asleep, is able to stay on task for ninety-two percent of a workday.

The ALJ also noted that "[a]lthough the claimant reported hypersensitivity to touch, he also testified that his wife washed the lower parts of his body that he could not reach when he sat in a shower chair" (Filing No. 15-2 at 28). The ALJ does not explain how Raymond U.'s complaints of hypersensitivity are inconsistent with his statement that his wife would wash his lower extremities. If the ALJ believed that a person experiencing the type and degree of hypersensitivity experienced by Raymond U. could not have their legs washed, then she must state as much and state her support for that conclusion.

Later in her decision, the ALJ drew a similarly unsupported conclusion about a suspected sunburn that Raymond U. reported during a medical examination (Filing No. 15-7 at 388 ("Visual examination of the lower extremities reveals that the skin of both lower extremities is reddened. He states that this is *probably* from sunburn." (emphasis added)). The ALJ concluded that Raymond U.'s sunburn "indicates that the claimant is either able to sit or stand in the sun, a couple of hours long enough to acquire sunburn" (Filing No. 15-2 at 30). In drawing this conclusion, the ALJ again "played doctor".  The ALJ offered no medical or other evidence supporting the assumption that it takes "a couple of hours" to acquire a sunburn, or that a person needs to be sitting or standing (instead of lying down) outside to acquire it.  She likewise offers no explanation for her implicit conclusion that a person experiencing the type and degree of pain experienced by Raymond U. could not acquire a sunburn.  This statement by the ALJ is yet another example of the type of unfounded reasoning endemic to her decision.

The ALJ improperly relied on cherry-picked and mischaracterized evidence, failed to draw a logical bridge between the above evidence and her subjective symptom analysis and RFC determination, and failed to support her decision with substantial evidence.  The denial of benefits for the period of August 26, 2014, to July 6, 2018, must therefore be remanded.

       **2.**       **Failure to Properly Evaluate Medical Opinions**

      Raymond U. next argues that the ALJ failed to give appropriate weight to medical opinions. Because remand is appropriate for the reasons discussed above, the Court need not resolve this issue. Nevertheless, Raymond U.'s argument is well taken. The ALJ appears to have tied the weight she gave certain opinions to whether or not they were consistent with the above evidence (Filing No. 15-2 at 29 ("These opinions were given some weight because they were largely consistent with other evidence dated prior to the established onset date . . . ."); *id.* ("This opinion was given only some weight because it only applied for a limited time of less than one year. It was also inconsistent with other evidence discussed in this decision."). Because the ALJ's evaluation of the medical opinions was tied to her erroneous evidentiary analysis, she must reconsider her evaluation of the medical opinions on remand. In reassessing these opinions, the ALJ must be careful not to assign weight to opinions simply because they are consistent with select evidence supporting a denial of benefits. "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

      The Court also notes two points of concern with respect to the weight the ALJ gave certain opinions. First, the ALJ gave the opinion of Dr. Wolf "limited weight because it came from an examining source but was based on a one-time examination in a non-treating context," but gave the opinions of the DDS physical consultants more weight ("some weight"), even though the DDS physical consultants' opinions were developed in a non-treating context with *no* physical examination (Filing No. 15-2 at 29, 30; Filing No. 15-3 at 11, 23). Second, in evaluating the opinion of Krista Hodges, CNP, which the ALJ also gave "limited weight," the ALJ "note[d] that there are obviously different handwritings/penmanship on the opinion form.".(Filing No. 15-2 at 30.) It appears the ALJ was implying that a portion of CNP Hodges' records were completed by

17

someone else, or even falsified, and that those records might therefore be inaccurate or unreliable. However, the ALJ supported this belief with nothing but speculation. The ALJ did not ask CNP Hodges about this perceived discrepancy, and she did not consult a handwriting expert or anyone familiar with CNP Hodge's handwriting. It would be wholly inappropriate for the ALJ to assign less weight to CNP Hodges' opinion simply because of suspicions about her handwriting.

### 3. Failure to Consider Listing 11.14

Raymond U. lastly argues that the ALJ erred by failing to consider Listing 11.14 at step three of her analysis. However, because the Commissioner's decision must be remanded for the above reasons, the Court need not reach this argument.

### V. CONCLUSION

For the reasons stated above, the final decision of the Commissioner is **REMANDED** for further proceedings consistent with this Entry as authorized by the fourth sentence of 42 U.S.C. § 405(g).

**SO ORDERED**.

Date: 9/22/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jessica Mae Davis
KAPOR DAVIS & ASSOCIATES, LLC
jess.kdlaw@gmail.com

Brian J. Alesia
SOCIAL SECURITY ADMINISTRATION
brian.alesia@ssa.gov

Jane Kuczek
SOCIAL SECURITY ADMINISTRATION
jane.kuczek@ssa.gov

Adam R. Sorkin
Office of the Regional Chief Counsel, Region V
SOCIAL SECURITY ADMINISTRATION
Harold Washington Social Security Center
600 West Madison Street, 6th Floor
Chicago, Illinois  60661-2474

John J Stark
UNITED STATES ATTORNEY'S OFFICE
303 Marconi Boulevard
Suite 200
Columbus, Ohio  43215

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov